IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSE CRUZ GONZALEZ-SANCHEZ,<br><br>Defendant. | **ORDER AND MEMORANDUM DECISION**<br><br><br>Case No. 2:07-CR-00838-TC-BCW |

A grand jury has indicted Mr. Jose Cruz Gonzalez-Sanchez for possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). He has filed a motion to suppress evidence found during a search of the vehicle he was driving and evidence of a statement he made following his arrest.

Mr. Gonzalez-Sanchez challenges his initial stop, the scope and duration of his detention, the search of the Explorer and the admissibility of the statement he made following his arrest. Because the evidence in this case and the applicable law do not support Mr. Gonzalez-Sanchez's contentions, the court DENIES THE MOTION.

FINDINGS OF FACT

On the morning of November 8, 2007, Trooper Charles Taylor of the Utah Highway Patrol stopped Mr. Gonzalez-Sanchez, who was driving a red Ford Explorer with California license plates. At the hearing on Mr. Gonzalez-Sanchez's motion,

Trooper Taylor, who was a credible witness, testified that he stopped Mr. Gonzalez-Sanchez because Mr. Gonzalez-Sanchez twice failed to properly signal when changing lanes. As he was making the stop, Trooper Taylor activated a videorecorder inside his patrol car.[1]

Trooper Taylor walked to the passenger side of the Explorer. (Mr. Gonzalez-Sanchez was the sole occupant.) Trooper Taylor introduced himself, explained to Mr. Gonzalez-Sanchez that he had stopped him because of the signal violations, and asked Mr. Gonzalez-Sanchez for a driver's license, vehicle registration and proof of insurance. Mr. Gonzalez-Sanchez handed the trooper a driver's license from North Carolina bearing the name "Jose Cruz Sanchez." As the trooper examined the license, Mr. Gonzalez-Sanchez continued to search in the glove compartment. Trooper Taylor immediately noticed the poor quality of the picture on the license. He testified: "It was a poor quality. It was blurry is what it was. It resembled the person that I had there, but it was very blurry, a quality of a driver's license that I'm not used to seeing. I'm used to seeing a very crisp, clean picture that identifies the person." (Suppression Hr'g Tr. 14, Mar. 14, 2008 ("Tr.").)

---

[1] The government introduced the recording of the stop, Exhibit 3, at the hearing. Trooper Taylor explained that the times shown on the recording are not accurate. For example, although Trooper Taylor stopped Mr. Gonzalez-Sanchez at 11:07 a.m., the time on the recording indicates 12:02:02 p.m. when Mr. Gonzalez-Sanchez's vehicle came to a complete stop. The court has reviewed the recording and from time to time in this order, notes relevant times as shown on the recording.

While Mr. Gonzalez-Sanchez continued his apparent search for documents in the glove compartment, Trooper Taylor asked him where he was going. Mr. Gonzalez-Sanchez answered that he was traveling from California to Ohio to interview for a job with a company called "Panther Trucking." Standing by the passenger side, Trooper Taylor saw what he described as "limited luggage" in the Explorer, and he smelled "an overwhelming odor of air freshener." (Id. at 16.)

Mr. Gonzalez-Sanchez handed Trooper Taylor a car title. Mr. Gonzalez-Sanchez appeared confused about the name on the title. At first, Mr. Gonzalez-Sanchez told the trooper that the Explorer belonged to "Romeo," and pronounced the name " RO-MAY-O." (Gov't Ex. 3.) Then he quickly repeated the name, pronouncing it as "RO-MEE-O." (Id.) (The name on the title is "Campos Romero," not "Romeo".) (Gov't Ex. 1.) Trooper Taylor testified that titles are normally not kept inside the vehicle because "[i]f they steal your car and have the title, they sign it over, and then they re-register it in their name." (Tr. 19.) Trooper Taylor was suspicious that the Explorer had been stolen.

Trooper Taylor asked Mr. Gonzalez-Sanchez if he would come to his patrol car. Before Mr. Gonzalez-Sanchez got into the patrol car, Trooper Taylor asked him if he could search his pockets. Mr. Gonzalez-Sanchez agreed and, while doing the search, Trooper Taylor found a large roll of money, two thousand dollars. Mr. Gonzalez-Sanchez told the trooper that he had won the money gambling.

In the patrol car, Trooper Taylor called dispatch (the time on the video is 12:05:36 p.m.) and asked that a check be made on the North Carolina driver's license Mr. Gonzalez-Sanchez had given him. He also asked whether Mr. Gonzalez-Sanchez had any

outstanding warrants. As Trooper Taylor waited for the information from dispatch, he began to write a warning citation for Mr. Gonzalez-Sanchez. At the same time, he asked him questions about the purpose of his trip.

Mr. Gonzalez-Sanchez told Trooper Taylor that he was a truck driver going to Ohio for a job orientation but he had a home in North Carolina that he planned on visiting after his job orientation to move a big television back to California. According to Mr. Gonzalez-Sanchez, he had an uncle in San Jose, California, who was seriously ill, and Mr. Gonzalez-Sanchez was going to visit him.

At the hearing, Trooper Taylor explained why he thought that Mr. Gonzalez-Sanchez's travel plans just didn't make sense:

> He's flown out to see a sick uncle, then to do an interview in Ohio, and then back to North Carolina, then to fly back to see the sick uncle is what I'm understanding . . . . The vehicle is a borrowed vehicle from California. How does he intend to get this back to the owner? Doesn't make sense. Why would he be flying if he's got to get it back to the owner? How is this owner going to get the car?

(Tr. 25.)

Trooper Taylor asked Mr. Gonzalez-Sanchez again about the owner of the Explorer. Although Mr. Gonzalez-Sanchez claimed that he had known the owner for five years, he did not know the owner's last name.

Trooper Taylor made two calls to see if law enforcement had information about possible criminal activities Mr. Gonzalez-Sanchez was involved in because, as Trooper Taylor testified, by this time he was suspicious that Mr. Gonzalez-Sanchez was involved in some sort of criminal activity. As he waited for the information, Trooper Taylor continued to fill out the citation. Dispatch called Trooper Taylor, telling him that the

North Carolina license was not "on file." (Id. at 30.)

At the hearing, Trooper Taylor explained that "licenses when you give them a number come back . They are on file. They—if they don't come back on file, it concerns me that it's a fake i.d." (Id. at 31.) At about this same time, Mr. Gonzalez-Sanchez offered to give Trooper Taylor a shirt that he supposedly had won at a casino, an offer that Trooper Taylor found unusual. After learning that the North Carolina driver's license was not on file, Trooper Taylor asked Mr. Gonzalez-Sanchez if he was licensed in another state. Mr. Gonzalez-Sanchez told the trooper that he had previously had a California license. Trooper Taylor radioed dispatch to check for a California license. Dispatch told Trooper Taylor that there was a license in that name that was expired and linked to a charge of driving under the influence. After receiving more information, Trooper Taylor concluded that the California license was not Mr. Gonzalez-Sanchez's.

Trooper Taylor completed the warning citation, handed it and Mr. Gonzalez-Sanchez's documents to him and again explained the two-second warning rule. As Mr. Gonzalez-Sanchez walked back to his car, Trooper Taylor called to him, and asked him if he could search his car. Mr. Gonzalez-Sanchez answered, "You can check my car . . . . Well, I don't want you to search but if you want to search it, go ahead." (Gov't Ex. 3 at 12:21 p.m.) Before starting the search of the Explorer, Trooper Taylor again asked Mr. Gonzalez-Sanchez whether he could search the Explorer: "Ok, so before you go I can search your car?" Mr. Gonzalez-Sanchez answered, "Yeah, you can look at it." (Id.)

Trooper Taylor and Steve Salas, another trooper with the Utah State Highway Patrol, who had arrived a few moments earlier, began to search the Explorer. Trooper Salas found what he believed to be "a discrepancy" in the firewall. (Tr. 76.) Trooper Salas had previously seen drugs transported in the firewall of a Ford.

At about this time, Trooper Salas let his drug-detection dog, Chase, out of his patrol car. (Trooper Salas is a certified dog handler; Chase is certified in drug detection.) Chase did not indicate when he sniffed the exterior of the Explorer but when Trooper Salas let him inside, he began scratching at the dashboard area. The troopers used tools to look inside that area but found nothing. When they searched the rear of the Explorer, they found a hidden compartment which contained cocaine.

Mr. Gonzalez-Sanchez was arrested and taken to the Summit County Jail. There he was interviewed by Officer Craig Hicken, who was at the time assigned to the Metro Narcotics Task Force. Officer Hicken, a witness at the hearing, testified that he advised Mr. Gonzalez-Sanchez of his rights, using a standard form issued by the Drug Enforcement Agency. (Gov't Ex. 4.) Mr. Gonzalez-Sanchez, after being advised of his rights, told Officer Hicken that he understood his rights but that he didn't know anything and asked for an attorney. Officer Hicken recognized that the interview was over but told Mr. Gonzalez-Sanchez that he would be charged with the drugs that were found in his vehicle. Mr. Gonzalez-Sanchez then said, "It's not my shit." (Tr. 91.) Officer Hicken testified that he expected no response from Mr. Gonzalez-Sanchez but was simply "stating a matter of fact, that this is where we were proceeding from here." (Id. at 90.)

During an inventory search of the Explorer, troopers found a California registration for the Explorer in the name of Romero Campos (Gov't Ex. 2) and an insurance card in the name of Romeo Campos Mandragon. (Gov't Ex. 5.) The name "Gonzalez Sanchez, Jose Cruz" appears on the card as an "added driver" with the notation of an "outstanding suspense . . . . Copy of valid U.S. Driver's license . . . ." (Id.)

ANALYSIS

Standing

The government contends that Mr. Gonzalez-Sanchez has not met his burden of showing that he has standing to challenge the search of the Explorer. The government points out that Mr. Gonzalez-Sanchez did not know the last name of the registered owner, the record is unclear whether the first name of the owner was "Romeo" or "Romero," and although Mr. Gonzalez-Sanchez appears to be listed as an approved driver on the insurance card, Mr. Gonzalez-Sanchez, who did not testify at the hearing, presented no evidence how his name came to be listed on the card nor the significance of the suspension notation.

The Tenth Circuit has given three factors for a court to consider in determining whether a defendant has shown that he has standing to contest a search of a vehicle: "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle." United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000) (internal citations omitted). Moreover, the Allen court noted that

"the mere fact of presence in the car, or even possession of the car keys, [is] insufficient to meet the defendant's burden of proving standing." (Id.)

These factors do not favor Mr. Gonzalez-Sanchez's position. First, Mr. Gonzalez-Sanchez did not claim ownership of any items in the Explorer and expressly disclaimed ownership over the cocaine when he spoke to Officer Hicken. Second, Mr. Gonzalez-Sanchez did not testify at the trial. Finally, the only evidence presented at the hearing about Mr. Gonzalez-Sanchez's contention that he was loaned the Explorer by "Romeo" was the insurance card and Trooper Taylor's testimony about Mr. Gonzalez-Sanchez's apparent lack of knowledge of the last name of the owner. In light of these factors, it appears to the court that Mr. Gonzalez-Sanchez does not have standing to contest the search of the Explorer.

The law is clear that "although a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention." United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000). Accordingly, and because the court has concluded that even if Mr. Gonzalez-Sanchez did have standing to challenge the search of his vehicle, the motion would be denied, the court is going to assume for purposes of this analysis that Mr. Gonzalez-Sanchez does have standing to challenge the search of the Explorer.

The Stop and the Detention

It is well-established that the reasonableness of a traffic stop is analyzed under the two-prong test set forth in Terry v. Ohio, 392 U.S. 1, 20 (1968). First, a court must determine whether the stop was justified at its inception and second, whether the detention "was reasonably related in scope to the circumstances which justified the interference in the first place." Id.

    1. the stop

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). Trooper Taylor testified convincingly that he stopped Mr. Gonzalez-Sanchez for twice failing to properly signal before changing lanes.[2] And at various times in the video recording, Trooper Taylor discussed with Mr. Gonzalez-Sanchez the reason for the stop and the necessity to signal when changing lanes.[3]

The court finds that the stop was justified at its inception.

    2. the length and scope of the detention

Mr. Gonzalez-Sanchez contends that he was unreasonably detained because Trooper Taylor questioned him about topics unrelated to the purpose of the stop and

---

[2]"A signal of intention to turn right or left or to change lanes shall be given continuously for at least the last two seconds preceding the beginning of the movement." Utah Code Ann. § 41-6a-804 (1) (b).

[3]Trooper Taylor explained the two-second signaling law immediately after introducing himself to Mr. Gonzalez-Sanchez at the beginning of the stop and then again, when he returned Mr. Gonzalez-Sanchez's paper-work to him.

caused unnecessary delays when he didn't immediately respond to dispatch because he was speaking to another officer.

The Tenth Circuit has recognized that "[a]n officer conducting a routine traffic stop may run computer checks on the driver's license, the vehicle registration papers, and on whether the driver has any outstanding warrants or the vehicle has been reported stolen." United States v. Mendez, 118 F.3d 1426, 1429 (10th Cir. 1997) (internal citations omitted.)  The video recording shows that for the first twenty minutes or so of Mr. Gonzalez-Sanchez's detention, Trooper Taylor was attempting to verify whether Mr. Gonzalez-Sanchez had a valid driver's license and whether the Explorer was stolen. Moreover, any other time spent by Trooper Taylor as he asked Mr. Gonzalez-Sanchez questions about his travel plans and as he checked to see if Mr. Gonzalez-Sanchez had a criminal history or was known to law enforcement was minimal and did not unreasonably prolong the detention.  Accordingly, it did not violate the Fourth Amendment.  United States v. Wallace, 429 F.3d 969, 974 (10th Cir. 2005) ( "As long as the [deputy's] questioning did not extend the length of the detention, . . . there is no Fourth Amendment issue with the respect to the content of the questions") (internal citations omitted).

Finally, any increase in the length and scope of the detention was justified by Trooper Taylor's reasonable suspicion that Mr. Gonzalez-Sanchez was engaged in illegal activity.  Trooper Taylor, who was clearly experienced in recognition and investigation of drug trafficking (Tr. 5-10), testified about the numerous "indicators" that caused him to first question whether the Ford Explorer was stolen and then to suspect that Mr. Gonzalez-Sanchez was carrying drugs.  First, the North Carolina driver's license raised

warning flags because of the smudged picture and because there was no record of it on file. Trooper Taylor also noticed, when he first stepped to the passenger window, that there was a strong odor of air freshener coming from the Explorer. Trooper Taylor was concerned by the fact that Mr. Gonzalez-Sanchez gave him a car title, not a certificate of registration, and appeared to be uncertain about the name on the title.

Trooper Taylor noted other factors which heightened his suspicions: When he searched Mr. Gonzalez-Sanchez before they got into the patrol vehicle, Trooper Taylor found approximately two thousand dollars in cash in Mr. Gonzalez-Sanchez's pocket. As he questioned Mr. Gonzalez-Sanchez about his travel plans, Trooper Taylor believed that the plans didn't make sense. And Mr. Gonzalez-Sanchez didn't know the last name of the owner of the Explorer who had supposedly loaned it to him. Finally, Mr. Gonzalez-Sanchez was driving on Highway I-80, a known drug-pipeline.

Based on the totality of the circumstances, the court concludes that Trooper Taylor's belief that Mr. Gonzalez-Sanchez was involved in criminal activity was reasonable. See United States v. Villa-Chaparro, 115 F.3d 797, 801 (10th Cir. 1997) (internal citations omitted.)

       3. the search of the Explorer

After Trooper Taylor had given Mr. Gonzalez-Sanchez the warning citation and returned the license and title, Mr. Gonzalez-Sanchez turned and began to leave. Trooper Taylor called to him, and asked if he could ask him more questions. Mr. Gonzalez-Sanchez agreed and turned back to talk to the trooper. The video recording shows that when Trooper Taylor asked if he could search the Explorer, Mr. Gonzalez-Sanchez first

said , "No, I don't want you to search my car, but if you want to search my car, go ahead." (Gov't Ex. 3.) Mr. Gonzalez-Sanchez then confirmed that Trooper Taylor could search.

Nothing in the video recording indicates that either Trooper Taylor or Trooper Salas used threats or coercion to cause Mr. Gonzalez-Sanchez to consent to either the continued questioning or the search. The recording also indicates that Mr. Gonzalez-Sanchez freely and intelligently gave his consent to the search even in light of his initial hesitation.

Accordingly, in light of all of the circumstances, the court concludes that the government has met its burden of establishing that Mr. Gonzalez-Sanchez's consent to continued questioning and the search of the Explorer was voluntary.

Mr. Gonzalez-Sanchez argues that in any event, the search was excessive and unreasonably destructive. And although the search involved the use of drills and other tools, the facts show that the troopers had probable cause to carry out the kind of search they did. Most significant was Crash's indicating on the dashboard of the Explorer.[4] It was after Crash's signal that the troopers brought out their tools and began working on the dashboard. Trooper Taylor then heard a hollow sound under the floor just behind the rear seat which, to him, meant that there was a hidden compartment in that area. The troopers started to search that area and, after a few minutes, Crash (who had been returned to Trooper Salas' patrol car), indicated there. Ultimately, the troopers did discover a hidden compartment containing cocaine in that area.

---

[4]Contrary to Mr. Gonzalez-Sanchez's contention, the court found nothing in its review of the video recording that shows that Trooper Salas' handling of Crash was in any way improper.

In United States v. Rosborough, 366 F.3d 1145 (10th Cir. 2004), the defendant argued that because the dog alerted on the front passenger area of the vehicle, the officers exceeded the scope of the dog's alert by searching the trunk. The court disagreed, noting "A dog alert creates general probable cause to search a vehicle; it does not implicate the precision of a surgeon working with scalpel in hand." Id. at 1153.

Moreover, there exists a separate, independent reason to justify the scope of the search: Mr. Gonzalez-Sanchez did not object at any time during the search, a fact which the Tenth Circuit has held is an indication that the officers did not exceed the scope of consent. United States v. McRae, 81 F.3d 1528, 1538 (10th Cir. 1996) (internal citations omitted.)

4. post-arrest statement

Mr. Gonzalez-Sanchez, after Officer Hicken advised him of his rights as required by Miranda v. Arizona, 384 U.S. 436 (1966), invoked his right to counsel. He now seeks to suppress the statement he made when Officer Hicken told him that he would be charged with all the drugs found in the Explorer.

The pivotal question is whether Officer Hicken's telling Mr. Gonzalez-Sanchez of the charges he faced was the "functional equivalent" of interrogation, that is, "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Officer Hicken testified that he did not intend that Mr. Gonzalez-Sanchez respond. (Tr. 90.) And the content of Officer Hicken's statement regarding the possible charges against Mr. Gonzalez-Sanchez does not rise to the level of interrogation.

See Easley v. Frey, 433 F.3d 969, 974 (7th Cir. 2006) (advising suspect of evidence against him and possible charges not interrogation.) (internal citations omitted.)

For the above reasons, Mr. Gonzalez-Sanchez's motion is DENIED.

SO ORDERED this 15th day of July, 2008.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL

Chief Judge